STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

ANNA NGUYEN (CABN 335873)
Special Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 420-7295
    FAX: (415) 436-7234
    Email: anna.nguyen@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CASE NO. CR 20-388JSC** |
| Plaintiff, | |
| v. | **GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| ALFREDO ALCALA-GOMEZ, | |
| Defendant. | |

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ...............................................................................................................1

I.       STATEMENT OF ISSUES TO BE DECIDED ...........................................................1

II.      LEGAL BACKGROUND ...........................................................................................2

         A.       The Federal Meat Inspection Act...................................................................2

         B.       Humane Slaughter Requirements ...................................................................3

         C.       Motion to Dismiss..........................................................................................5

III.     FACTUAL BACKGROUND .......................................................................................5

IV.      ARGUMENT ...............................................................................................................6

         A.       The FMIA Does Contain Criminal Prohibitions and Penalties. ....................6

         B.       Enforcement of the FMIA Is Not Limited to Licensed, Inspected Facilities.......................7

         C.       The Supreme Court Has Held that Intrastate Slaughter Activities in California Are Subject to the FMIA...................8

         D.       The Humane Slaughter Requirements of the FMIA Are Not Inscrutably Vague. ...................9

         E.       The Religious Slaughter Exemption Does Not Render the Information Invalid. ..............15

         F.       USDA Was Not Obligated to Give Defendant Notice Prior to Enforcement Action..................16

V.       CONCLUSION...........................................................................................................16

# TABLE OF AUTHORITIES

## CASES

*Dailey v. Veneman,*
   2002 WL 31780191 (6th Cir. Dec. 3, 2002) ........................................................................ 9

*McKelvey v. United States,*21
   260 U.S. 353 (1922)............................................................................................................ 16

*Nat'l Meat Ass'n v. Harris,*
   565 U.S. 452 (2012)...................................................................................2,4,6,7,8,9,10,11

*Schwartzmiller v. Gardner,*
   752 F.2d 1341 (9th Cir. 1984) ......................................................................................... 9, 15

*United States v. Banks,*
   514 F.3d 959 (9th Cir. 2008) ............................................................................................... 15

*United States v. Jenkins,*
   785 F.2d 1387 (9th Cir. 1986) ............................................................................................. 16

*United States v. Jimenez,*
   191 F. Supp. 3d 1038 (N.D. Cal. 2016) ............................................................................ 5, 6

*United States v. Shortt Accountancy Corp.,*
   785 F.2d 1448 (9th Cir. 1986) ............................................................................................... 5

*United States v. Wanland,*
   657 Fed. App'x 631 (9th Cir. 2016)..................................................................................... 16

*United States v. Zhi Yong Guo,*
   634 F.3d 1119 (9th Cir. 2011) ........................................................................... 10, 11, 13, 14

## STATUTES

7 U.S.C. 1901-1906 ..................................................................................................................... 15

7 U.S.C. § 1902 ...................................................................................................................... 1, 15

7 U.S.C. § 1902(a) ......................................................................................................... 12, 15, 16

7 U.S.C. § 1902(b) ............................................................................................................... 13, 15

21 U.S.C. § 601(k) ...................................................................................................................... 14

21 U.S.C. § 601(w) ....................................................................................................................... 2

21 U.S.C. § 603(a) ........................................................................................................................ 2

21 U.S.C. § 610 ........................................................................................................... 4,7,10,11,14

21 U.S.C. § 610(a) ..................................................................................................................... 3, 8

21 U.S.C. § 623 ............................................................................................................................. 3

21 U.S.C. § 623(a) ........................................................................................................................ 3

21 U.S.C. § 661(c) ................................................................................................... 11

21 U.S.C. § 661(c)(1) ............................................................................................... 11

21 U.S.C. § 674 ......................................................................................................... 3

21 U.S.C. § 676 .................................................................................................... 7, 11

21 U.S.C. § 676(a) ................................................................................................. 4, 6

21 U.S.C. §§ 601(h) ................................................................................................... 2

21 U.S.C. §§ 603(b) ................................................................................................ 7, 8

21 U.S.C. §§ 606 ....................................................................................................... 2

21 U.S.C. §§ 610(b) ............................................................................ 1,4,6,7,8,14,15

21 U.S.C. §§ 644 ..................................................................................................... 12

Pub. L. No. 95-445 ................................................................................................... 3

Pub. L. No. 109–97 ................................................................................................... 2

U.S.C. § 610(b) ....................................................................................................... 15

U.S.C. § 1902 ............................................................................................................ 3

U.S.C. § 1902(a) ..................................................................................................... 13

## **REGULATIONS**

9 C.F.R. Part 313 ...................................................................................................... 4

9 C.F.R. § 301(a)(2) .................................................................................................. 3

9 C.F.R. § 301.2 .............................................................................................. 2, 7, 10

9 C.F.R. § 303.1(a)(1) ............................................................................................... 3

9 C.F.R. § 313.15 .................................................................................................... 13

9 C.F.R. § 313.15(a)(1) ............................................................................................. 4

9 C.F.R. § 313.15(a)(3) ............................................................................................. 4

9 C.F.R. § 325.13 .................................................................................................... 14

9 C.F.R. § 325.19(e) ............................................................................................... 14

9 C.F.R. § 329.9 ...................................................................................................... 11

9 C.F.R. § 331.2 ...................................................................................................... 11

9 C.F.R. § 335.40(a)(4) ....................................................................................... 8, 16

9 C.F.R. §§ 313.5 ................................................................................................. 4, 13

9 C.F.R. §§ 500.1 – 500.7 ................................................................................................................ 2

9 C.F.R. §§ 500.2 .......................................................................................................................... 13

**INTRODUCTION**

In the course of operating an unlicensed, un-inspected commercial animal slaughtering operation, Defendant was videotaped hanging and killing an un-anesthetized goat in violation of the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. §§ 610(b), 676(a), which incorporates the provisions of the federal Humane Methods of Slaughter Act ("HMSA"), 7 U.S.C. § 1902. Without attempting to first render the goat unconscious prior to slaughter as required by federal law, Defendant hoisted the goat by his rear legs and then utilized a back and forth sawing action to move a blade across the goat's neck, all while the animal was still conscious. After the goat died from exsanguination, Defendant butchered the animal and sold the meat for $230.

Defendant conducted this activity outside the presence of U.S. Department of Agriculture inspectors. Federal law requires inspectors be present before, during, and after all commercial slaughtering activities, to protect public safety and to prevent the acute animal suffering depicted in the video. Defendant now seeks dismissal of the charge against him on several bases, including a request that the Court invalidate this vital public health and animal welfare law as vague. Defendant's arguments attempt to generate confusion in the law where none exists. Because the statute and the charging instrument are sound, the Court should deny Defendant's motion.

## I.  STATEMENT OF ISSUES TO BE DECIDED

1. Does the Federal Meat Inspection Act lack a criminal offense?

2. Can a defendant evade prosecution for inhumane slaughter by failing to obtain a "grant of inspection" (akin to a license)?

3. Does the Federal Meat Inspection Act violate the Commerce Clause of the U.S. Constitution?

4. Is the Federal Meat Inspection Act unconstitutionally vague?

5. Can defendant invoke the statutory exception for "ritual requirements of the Jewish faith or any other religious faith"?

6. Is USDA obligated to notify clandestine operators that it intends to refer them to the Department of Justice?

## II.      LEGAL BACKGROUND

### A.      The Federal Meat Inspection Act

First enacted in 1906, the FMIA is a comprehensive statutory scheme designed both to prevent "adulterated" or unsafe meat products from passing into the human food supply, 21 U.S.C. § 603(a), and to prevent "inhumane slaughtering." *Id.* § 603(b). The FMIA requires that all meat from enumerated species[1] that is "used in commerce" be inspected and passed by the U.S. Department of Agriculture ("USDA"; or an equivalent state program, not at issue here) to ensure that it is safe, properly labeled, and was humanely slaughtered. *Id.* §§ 603, 604. Inspections are required before, during, and after the slaughter process. *Id.* Federal inspection personnel must be present at all times during livestock slaughter operations and for at least part of each shift during which there is further processing of meat products. 21 U.S.C. §§ 606, 608. A facility operating under a "grant of inspection" (akin to a license) and thus lawfully, is known as an "official establishment." 9 C.F.R. § 301.2. USDA can suspend, withhold, or terminate a grant of inspection based on FMIA violations. *See* 9 C.F.R. §§ 500.1 – 500.7.

The FMIA applies to all slaughter of meat in interstate and foreign commerce. *See* 21 U.S.C. §§ 601(h), 603(a). The FMIA "also regulates slaughterhouses serving an exclusively intrastate market in any State that does not administer an inspection system with 'requirements at least equal to those' of the Act." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455, n.1 (2012) (citing 21 U.S.C. § 661(c)(1)). California is one such state. *Id.* (noting that "[b]ecause California has chosen not to adopt such an inspection program, the FMIA governs all slaughterhouses in the State (except for any limited to 'custom slaughtering for personal, household, guest, and employee uses,' § 623(a)).")). Therefore, in California and other states without a state-run food inspection program, all slaughter activity for commercial purposes, whether interstate or intrastate, is subject to the FMIA.

There are only two exceptions to the inspection requirements described above – the "Personal Use" exemption, and the "Custom" exemption. Under the "Personal Use" exemption, a person may slaughter livestock of his/her/their own raising for their personal use or that of their family or non-

---

[1] Covered species include "cattle, sheep, swine, goats, horses, mules, and other equines." 21 U.S.C. § 601(w); *see also* Pub. L. No. 109–97, November 10, 2005, 119 Stat 2120, § 798.

1    paying guests. 21 U.S.C. § 623; 9 C.F.R. § 303.1(a)(1). No meat produced under this exemption may be

2    sold commercially. *Id.*

3        The "Custom" slaughter inspection exemption is one in which the owner of an animal takes that

4    animal to a permit-holding "Custom" slaughter operation to be slaughtered, and the meat from that

5    animal returns to the animal's owner, for the owner's personal use and that of his/her/their family,

6    whereby none of the meat otherwise enters commerce. 21 U.S.C. § 623(a). Such a facility is required to

7    have a "Custom Exempt" permit from USDA, and to submit to an annual sanitary and record-keeping

8    inspections. *Id.*; *see also* 9 C.F.R. § 301(a)(2). Persons or facilities engaged in what would otherwise be

9    "Custom Exempt" slaughter but who do not have a permit or comply with its requirements, lose the

10    benefit of the exemption and thus become subject to the full requirements of the FMIA.

11        Unless one of these two exceptions applies, it is illegal to slaughter animals outside the purview

12    of USDA inspection. 21 U.S.C. § 610(a). The FMIA vests "United States district courts. . . with

13    jurisdiction specifically to enforce . . . this chapter. . . ." 21 U.S.C. § 674.

14    **B.**      **Humane Slaughter Requirements**

15        In 1958, Congress passed the HMSA, which requires that all meat purchased through federal

16    procurement and price support programs be slaughtered humanely. Specifically, the HMSA requires that

17    such livestock be:

18
19        (a) . . . rendered insensible to pain by a single blow or gunshot or an electrical, chemical
       or other means that is rapid and effective, before being shackled, hoisted, thrown, cast, or
       cut; or

20
21        (b) . . . slaughter[ed] in accordance with the ritual requirements of the Jewish faith or any
       other religious faith that prescribes a method of slaughter whereby the animal suffers loss
22        of consciousness by anemia of the brain caused by the simultaneous and instantaneous
       severance of the carotid arteries with a sharp instrument and handling in connection with
23        such slaughtering.

24    7 U.S.C. § 1902. In 1978, Congress extended the HMSA to all slaughterhouses by amending the FMIA

25    to require that meat products subject to the FMIA be produced "only from livestock slaughtered in

26    accordance with humane methods." Pub. L. No. 95-445, 92 Stat. 1069.

27

28

Specifically, Congress directly required slaughter activities to comply with the HMSA by amending 21 U.S.C. § 610 to prohibit the slaughter of livestock in a manner other than that specified in the HMSA:

> No person, firm, or corporation shall, with respect to any cattle, sheep, swine, goats, horses, mules, or other equines . . . slaughter or handle in connection with slaughter any such animals in any manner not in accordance with the Act of August 27, 1958 [the HMSA].

21 U.S.C. § 610(b) (listing "prohibited acts"). Pursuant to 21 U.S.C. § 676(a), most violations of 21 U.S.C. § 610, including the charge at issue here, are Class A misdemeanors. *See also Nat'l Meat Ass'n*, 565 U.S. at 466 ("A violation of those standards is a crime, see § 676").

The FMIA authorizes USDA to prescribe regulations further delineating which slaughtering and handling methods are deemed to be humane as that term is used in the HMSA and FMIA. USDA has promulgated such regulations in 9 C.F.R. Part 313. The regulations include: (1) humane handling requirements (*i.e.*, unloading animals and moving them to the stunning area); (2) stunning requirements (*i.e.*, rendering animals completely unconscious prior to slaughter); and (3) provisions regarding the handling of disabled, injured, or otherwise non-ambulatory animals.

With respect to the statutory requirement that animals be rendered insensible to pain prior to slaughter, the regulations deem four methods of stunning to be acceptable if done correctly. These include the use of a "captive bolt" instrument upon a specific location of the skull of the animal; electric stunning; the use of a chamber to dispense anesthetic gas; and discharge of gunshot into the brain by firearm. 9 C.F.R. §§ 313.5, 313.15, 313.16, 313.30. Such methods

> shall be applied to the livestock in accordance with this section so as to produce *immediate unconsciousness* in the animals *before* they are shackled [by one or more rear legs], hoisted [elevated fully off the floor following shackling], thrown, cast, or cut.

9 C.F.R. § 313.15(a)(1) (emphasis added). Animals "shall be stunned in a manner that they will be rendered unconscious with a minimum of excitement and discomfort." *Id.* The regulations further mandate that "[i]mmediately after the stunning blow is delivered the animals shall be in a state of complete unconsciousness and *remain in this condition* through shackling, sticking [*i.e.*, piercing of the carotid artery for exsanguination] and bleeding." 9 C.F.R. § 313.15(a)(3) (emphasis added).

1    **C.    Motion to Dismiss**

2    A pretrial motion to dismiss a criminal case is properly presented "if it involves questions of law

3    rather than fact." *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986)

4    (citations omitted). The district court is authorized to "make preliminary findings of fact necessary to

5    decide the questions of law presented by pretrial motions so long as the court's findings on the motion

6    do not invade the province of the ultimate finder of fact." *Id.* (internal quotations and citations omitted).

7    To aid the court in making such preliminary findings, the parties may submit "declarations and

8    exhibits." *United States v. Jimenez*, 191 F. Supp. 3d 1038, 1040 (N.D. Cal. 2016).

9    **III.    FACTUAL BACKGROUND**

10    Defendant conducted a commercial slaughter operation in American Canyon, California, by

11    which he maintained a herd of goats and other animals, and would slaughter and butcher them for

12    paying customers. *See* Att. A (certified transcript of recorded call-in which Defendant offered to

13    slaughter animals for compensation to an undercover investigator); Att. B (Declaration of Frederick

14    Dixon) (describing Defendant's slaughter of a goat and sale of the meat to a witness for $230, in the

15    presence of other waiting customers). USDA has no record of receiving any application for an FMIA

16    grant of inspection or a Custom Exempt permit on behalf of Defendant or any other applicant at the

17    address in question. *See*, *e.g.*, USDA Food Safety and Inspection Service, *FSIS Inspected*

18    *Establishments* https://www.fsis.usda.gov/inspection/fsis-inspected-establishments (last accessed Aug.

19    20, 2021).

20    On November 18, 2018, a customer arrived at that address, looking to purchase a freshly-

21    slaughtered goat. *See* Att. B (Dixon Decl.). The property owner took the customer to the Defendant, who

22    allowed the customer to select a live male goat from among others in a pen. *Id.* Defendant then led the

23    customer and the goat into a darkened barn area and hoisted the goat by his hind legs from a rope

24    hanging from the ceiling. *Id.* According to the customer, the goat was "kicking and screaming" and

25    attempting to free himself. *Id.* Without first attempting to render the goat insensible to pain as required

26    by law, Defendant then proceeded to cut the goat's throat. According to the customer, "[t]he knife must

27    not have been very sharp because as he was cutting the animal's through he was using a 'sawing

28    action.'" *Id.* Defendant drained the goat's blood into a bucket and the animal eventually passed away. *Id.*

1    This process was videotaped. *Id.*[2] The customer paid Defendant $230 for this transaction and stated that

2    "other clients" were also present at the location. *Id.* Because Defendant operated wholly outside of the

3    FMIA inspection system, no federal inspectors were present before, during, or after the slaughter.

4        USDA's Food Safety and Inspection Service ("FSIS") – the agency that implements the HMSA

5    – employs veterinary medical officers whose role is to inspect slaughter processes at licensed facilities

6    for humane slaughter and food safety compliance. One of these veterinarians, Dr. Lucy Anthenill,

7    reviewed the video and concluded that it depicts an "un-stunned slaughter." *See* Att. C (Declaration of

8    Dr. Lucy Anthenill). She observed: "the animal can be heard vocalizing and moving while a man makes

9    multiple cuts to the animal's throat with a knife," and that "the goat is conscious/not stunned when the

10   cuts are made." *Id.* She added, "I see no evidence of this being a religious or ritual slaughter." *Id.*

11   **IV.   ARGUMENT**

12       Defendant moved to dismiss the Information, *see* ECF No. 24 ("Def.'s Mot."), alleging that both

13   the statute and the charging document are unsound. Defendant's arguments ignore key statutory

14   provisions and try to project ambiguities about the law that are belied by the law's text. The Court

15   should deny Defendant's motion.

16       **A.    The FMIA Does Contain Criminal Prohibitions and Penalties.**

17       Defendant's first argument is that there is no mechanism for criminal enforcement of the FMIA's

18   humane slaughter requirements. *See* Def.'s Mot. at 3. This ignores 21 U.S.C. § 610(b), entitled

19   "Prohibited Acts," which provides that:

20       [n]o person, firm, or corporation shall, with respect to any cattle, sheep, swine, goats,
         horses, mules, or other equines . . . slaughter or handle in connection with slaughter any
21       such animals in any manner not in accordance with the Act of August 27, 1958 [the
22       HMSA].

23   21 U.S.C. § 610(b); *see also* Information (ECF No. 1) (charging Defendant with violating 21 U.S.C. §

24   610(b)). Violations of 21 U.S.C. § 610(b), including the charge at issue here, are punishable by up to one

25   year in prison as provided in the statute's criminal penalty section – another part of the law overlooked

26   by Defendant. 21 U.S.C. § 676(a). As the Supreme Court observed in *Nat'l Meat Ass'n*:

27

28   _____
     [2] The government has produced this video to the Defendant and will lodge a copy with the Court if it would be helpful to the
     Court.

     GOV'T RESPONSE TO MOT. TO DISM.

> [s]ince 1978, when Congress incorporated the HMSA's standards, the FMIA has required slaughterhouses to follow prescribed methods of humane handling, so as to minimize animals' pain and suffering. *See* 21 U.S.C. §§ 603(b), 610(b) [ ]. A violation of those standards is a crime, *see* § 676. . . . So the FMIA addresses not just food safety, but humane treatment as well.

565 U.S. at 466. The Court should reject Defendant's argument on this point, as it disregards the pertinent portions of the statute.

## B. Enforcement of the FMIA Is Not Limited to Licensed, Inspected Facilities.

Defendant next asserts that the FMIA does not apply to him because the law "applies only to slaughterhouses subject to mandatory inspection." Def.'s Mot. at 3. Although, as Defendant's citations indicate, the FMIA certainly does apply to facilities operating under a grant of inspection, nothing in the law limits its application to such facilities. The prohibition in 21 U.S.C. § 610, which is at issue here, applies on its face to *any* "person, firm, or corporation" and *any* "establishment preparing [meat] for commerce." The term "establishment" is not defined in the statute, but the prohibition in 21 U.S.C. § 610 is conspicuously *not* confined to "*official* establishments," which, as noted above, is the term used for legitimate facilities at which USDA maintains constant sanitary and humane inspection. 9 C.F.R. § 301.2. Similarly, the criminal penalties apply broadly to "*any* person, firm, or corporation who violates any provision of this chapter," 21 U.S.C. § 676 (emphasis added) – and not solely to "official establishments."

This makes sense, because if slaughter operations of any size could simply avoid the FMIA's requirements by foregoing inspection, it would render the FMIA and its food safety and animal welfare protections a total nullity. On that very point, the Supreme Court has explained that

> the FMIA has required slaughterhouses to follow prescribed methods of humane handling, so as to minimize animals' pain and suffering. *See* 21 U.S.C. §§ 603(b), 610(b) [ ]. A violation of those standards is a crime, *see* § 676, and the Secretary of Agriculture can [also] suspend inspections at—*and thus effectively shut down*—a slaughterhouse that disobeys them, *see* §§ 603(b), 610(c).

*Nat'l Meat Ass'n,* 565 U.S. at 466 (emphasis added). Clearly, Congress intended the withholding of inspection to be a sanction for illegal conduct, not a retreat of agency presence that permits an entity to continue violating the law. Because processing meat without inspection is itself a violation, *see* 21 U.S.C. § 610 (unlawful to operate "except in compliance with the requirements of this chapter [the

1    FMIA]"), it makes no sense to limit the law's prohibitions to only entities maintaining a grant of

2    inspection.

3    Defendant cites 21 U.S.C. § 603(b) in support of his argument, but that is taken out of context

4    and also does not contradict the authorities cited above. The portion of 21 U.S.C. § 603(b) cited by

5    Defendant is a directive to USDA to install humane slaughter inspectors in slaughtering establishments

6    previously inspected only for food safety (prior to the enactment of the HMSA). USDA cannot appoint

7    inspectors at a facility if the agency does not know a facility exists.

8    Further, the FMIA's regulations plainly envision enforcement against "clandestine," un-

9    inspected operations such as that of Defendant. *See* 9 C.F.R. § 335.40(a)(4) (exempting "clandestine"

10   slaughter facilities from administrative notice and comment requirement prior to criminal referral;

11   discussed further below). Indeed, because the public safety and animal welfare threats posed by an

12   entirely un-inspected facility are potentially much greater than a facility with continuous inspection, it is

13   equally if not more important to apply the law to such operators. Defendant's argument, if accepted,

14   would effectively negate the FMIA as to both inspected and un-inspected facilities because no entities

15   would have any reason to submit to inspection if they could avoid the FMIA entirely simply by

16   foregoing inspection. This vital statute has been protecting public health and upholding the fabric of

17   American agriculture for 115 years. The Court should decline Defendant's absurd premise.

18       **C.**    **The Supreme Court Has Held that Intrastate Slaughter Activities in California Are**
19                 **Subject to the FMIA.**

20   Defendant further asserts that his prosecution violates the Commerce Clause of the U.S.

21   Constitution, because it was not commercial and did not involve interstate movement of animals or

22   people. Def.'s Mot. at 4-5. These assertions fail as well. As noted above, Defendant's operation was

23   indeed a commercial one. *See* section III above. And contrary to Defendant's assertion, commerce *is* an

24   element of the offense alleged in 21 U.S.C. § 610(b). That provision makes it unlawful to "slaughter . . .

25   any *such* animals" in an inhumane manner, referring to 21 U.S.C. § 610(a) (animals slaughtered "for

26   commerce").

27   The fact that no animals, people, or funds may have crossed a state line is irrelevant, in light of

28   the Supreme Court's decision in *Nat'l Meat Ass'n*, which, as previously explained, affirmed the

application of the FMIA to purely intrastate commerce in California and other states that similarly do not have a state-run FMIA inspection program. *Nat'l Meat Ass'n* involved a challenge to a California state law that attempted to extend the state's animal cruelty statute to certain activities within slaughter establishments. *See* 565 U.S. at 458-59. The Supreme Court invalidated the California statute as pre-empted by the FMIA. *Id.* at 467. In so holding, the Supreme Court stated that the FMIA "also regulates slaughterhouses serving an *exclusively intrastate market* in any State that does not administer an inspection system with 'requirements at least equal to those' of the Act." *Id.* at 455 n.1 (emphasis added; quoting 21 U.S.C. § 661(c)(1)).[3] California is one such state. *Id.* (noting that "[b]ecause California has chosen not to adopt such an inspection program, the FMIA governs all slaughterhouses in the State (except for any limited to 'custom slaughtering for personal, household, guest, and employee uses,' § 623(a)).").

This holding is significant not only because it affirms the authority of Congress to regulate intrastate commerce in the area of food production, but also because it makes plain that no other enforcement mechanism is available to address the animal cruelty problem posed by Defendant's operation. If the FMIA's enforcement mechanisms cannot be brought to bear on this problem, nothing can. The Supreme Court has put this issue beyond the reach of state lawmakers and placed "the authority – and indeed responsibility" for confronting it upon federal authorities. *Id.* at 466. Defendant's construction of the law ignores binding precedent and would create a gaping enforcement void, to the very real detriment of animal welfare and food safety.

### D. The Humane Slaughter Requirements of the FMIA Are Not Inscrutably Vague.

Defendant also argues that the statute is invalid because it is unconstitutionally vague. Def.'s Mot. at 5-8. Defendant's arguments on this point are premised on an incomplete recitation of the statute and its precedent. A statute is void for vagueness only if it completely fails to give notice to people of ordinary intelligence as to the conduct it proscribes, or if it yields arbitrary and discriminatory enforcement based on unclear text. *See Schwartzmiller v. Gardner*, 752 F.2d 1341, 1345 (9th Cir. 1984). In analyzing vagueness challenges, courts consider not only the statutory text, but also any

---

[3] The intrastate commerce application of the FMIA has been upheld in other contexts as well. *See Dailey v. Veneman*, 2002 WL 31780191, *4 (6th Cir. Dec. 3, 2002) (rejecting challenge to USDA inspection of "solely intrastate activity").

implementing regulations, which should be "read together" with the statute. *United States v. Zhi Yong Guo*, 634 F.3d 1119, 1122–23 (9th Cir. 2011). When that standard is applied here, it is plain that the FMIA more than passes constitutional muster.

At the outset, it should be noted that the statute's real-world application shows that a person of ordinary intelligence could understand with and conform his/her/their conduct with the FMIA. Of the over 6,500 slaughter facilities inspected by FSIS in the United States, approximately 5,200, or 80 percent, are categorized as "small or very small" businesses. *See*, *e.g.*, https://www.pnwag.net/2020/08/26/fsis-continues-efforts-to-reach-out-to-smaller-meat-processors/ (Aug. 26, 2020). Thus, FMIA compliance is not the exclusive province of giant corporate concerns. The principal of each one of these 5,200 small facilities across the country was able to understand the law and apply for a grant of inspection, within a system that has been ongoing for decades. As both practical application and the foregoing analysis show, the FMIA is not unconstitutionally vague.

**1.     The FMIA Plainly Does Not Limit Its Application to Official Establishments.**

Some of Defendant's vagueness arguments are based on other substantive assertions in his motion, rebuffed elsewhere in this memorandum. Indeed, Defendant seems to argue that his ability to raise legal arguments necessarily renders the law vague. Def.'s Mot. at 5. If that premise were true, few laws would survive a vagueness challenge. In any event, the law's plain text belies Defendant's assertions. First, Defendant argues that it is not clear whether the statute applies only to official establishments. *See* Def.'s Mot. at 5. However, as explained above in section B, the pertinent provisions apply to *any* "person, firm, or corporation," without qualification as to whether the establishment is an "official" one or not. *See* 21 U.S.C. §§ 610, 676; 9 C.F.R. § 301.2.

**2.     As Understood and Complied With By Thousands of Small Slaughter Operations, the FMIA Applies to Intrastate Commerce in California and Certain Other States.**

Similarly, Defendant argues that the law's application to intrastate commerce is unclear. Def.'s Mot. at 6. But as shown above in section C, the FMIA "regulates slaughterhouses serving an exclusively intrastate market in any State that does not administer an inspection system with 'requirements at least equal to those' of the Act." *Nat'l Meat Ass'n*, 565 at 455 n.1 (quoting 21 U.S.C. § 661(c)(1)). This

holding is derived from the plain language of 21 U.S.C. § 661(c), which has been in existence for more than fifty years. That provision applies the pertinent sections of the FMIA to "operations and transactions wholly within such state" in all states that do not have a state-run FMIA inspection program. 21 U.S.C. § 661(c)(1). The FMIA's implementing regulations include a list of these state-run inspection programs. 9 C.F.R. § 331.2. USDA also maintains this information on a public website. *See* USDA Food Safety and Inspection Service, *States With and Without Inspection Programs*, https://www.fsis.usda.gov/inspection/apply-grant-inspection/state-inspection-programs/states-and-without-inspection-programs. This list has remained the same during the time period between the incident in question and now. *Id.* (noting last updated Mar. 23, 2015).

Defendant attempts to generate confusion on this point by citing to two law review articles that claimed that "[p]lants that do not produce meat for interstate commerce do not have to meet HMSA criteria." Def.'s Mot. at 6 (citations omitted). However, these student notes are simply inaccurate, and also pre-date *Nat'l Meat Ass'n*. Defendant also cites to an FSIS guidance document explaining that federally inspected meat can be sold in interstate commerce, while that produced under state inspection can only be sold in intrastate commerce. *See id.* (citation omitted). Those points are true, but inapposite here. They are separate from, and do not contradict, 21 U.S.C. § 661(c), summarized by the Supreme Court and set forth above. The FMIA applies to intrastate commerce here, and the basis for that is clear.

### 3. The Law's Criminal Provisions Are Clear and Have Been Enforced Against Inhumane Slaughter.

Defendant also re-asserts here his argument that the FMIA lacks criminal prohibitions, arguing the law "is vague about whether criminal sanctions are available." Def.'s Mot. at 7.[4] But as explained in section A, the criminal prohibitions are plain and are set forth in 21 U.S.C. §§ 610 and 676 – two provisions ignored by Defendant's argument. Defendant's citations to GAO reports and a law review article about the existence of administrative sanctions are not to the contrary. *See* Def.'s Mot. at 7. As with many laws, the FMIA contains both administrative and criminal penalties. The existence of the

---

[4] Defendant also cites 9 C.F.R. § 329.9 as "highlighting criminal provisions of FMIA as covering bribery, receipt of gifts and assault of and interference with FSIS employees." Def.'s Mot. at 8. This regulation, on its face, describes "but [is] not limited to" these offenses. 9 C.F.R. § 329.9. As noted above, section 676 criminalizes many violations of the FMIA, including the one at issue here. 21 U.S.C. § 676.

former does not cloud or confuse the latter. As noted above, the existence of criminal penalties is particularly important for clandestine operations, since the levying of administrative sanctions, such as withdrawal of inspection, would be utterly pointless. *See* section B above.

In service of this argument, Defendant claims a lack of criminal enforcement under the FMIA for inhumane treatment. Def.'s Mem. at 7-8. While it is extremely difficult for the government to detect the presence of clandestine operations such as that of Defendant, where it has been able to do so and has verified inhumane practices, it has pursued criminal charges. *See*, *e.g.*:

- *United States v. Curbelo*, 1:11-cr-20283 (S.D. Fla., indicted Apr. 19, 2011) (defendant running un-inspected slaughter operation convicted of inhumane slaughter in violation of 21 U.S.C. § 610(b) and 7 U.S.C. § 1902(a));

- *United States v. Hernandez, et al.*, 1:12-cr-20590 (S.D. Fla., indicted Aug. 9, 2012) (defendants running un-inspected slaughter operation indicted on humane slaughter and other FMIA violations; pleaded guilty to violating 21 U.S.C. § 610(c)(2));

- *United States v. Middaugh*, 1:12-mj-59 (W.D.N.Y., Information filed Feb. 8, 2013) (defendant, who slaughtered and butchered animals for commerce and who maintained farm animals in inhumane conditions requiring euthanasia, bought and transported dying, disabled, and diseased animals outside of FMIA regulatory scheme in violation of 21 U.S.C. §§ 644, 676(a));

- *United States v. Cervantes*, 5:14-cr-3 (S.D. Miss., Information filed Jan. 22, 2014) (defendant convicted of inhumane slaughter in violation of 21 U.S.C. § 610(b) and 7 U.S.C. § 1902(a));

- *United States v. Ortega*, 8:14-cr-85 (M.D. Fla., (defendant running un-inspected slaughter operation convicted of inhumane slaughter in violation of 21 U.S.C. § 610(b) and 7 U.S.C. § 1902(a), as well as selling uninspected and adulterated meat);

- *United States v. Vilog*, 2:17-cr-265 (W.D. Wash., indicted Oct. 18, 2017) (defendant inhumanely slaughtered animals and sold adulterated meat after Custom Exempt license revoked); and

- *United States v. Gonzalez*, 9:18-cr-80105 (S.D. Fla., Information filed May 23, 2019) (defendant running un-inspected slaughter operation convicted of inhumane slaughter in violation of 21 U.S.C. § 610(b) and 7 U.S.C. § 1902(a)).

These cases arose out of fact patterns similar to the one at bar here, and did not involve interstate movement of animals, meat, or people, except for *Cervantes*. The FMIA's criminal provisions are plain and have been used in similar situations.

        **4.**    **The Presence of Parallel Administrative Enforcement Does Not Render This or Any Other Law Vague or Arbitrary.**

1    Defendant next tries to generate the appearance of ambiguity in the law by contrasting this case

2    to examples of the law's administrative enforcement scheme. *See* Def.'s Mot. at 7-8. However, the

3    simultaneous presence of both criminal and administrative sanctions in a law is not unique and it does

4    not render the law hopelessly arbitrary. It is not surprising that many more violations of the law are

5    detected at inspected facilities as opposed to un-inspected ones because, as explained above, inspectors

6    maintain constant presence at all hours at the more than 6,500 properly licensed facilities in the United

7    States.[5] Administrative sanctions are often appropriate remedies in that context because some can be

8    imposed immediately by inspectors without court process. *See*, *e.g.*, 9 C.F.R. §§ 500.2, 500.3. These

9    deficiencies are usually corrected immediately by the plants, in the inspectors' presence, in order to

10   continue operating, as Defendant's cited reports demonstrate.

11   Such administrative sanctions are pointless to furtive operations like Defendant's, because those

12   operators already have no grant of inspection. The absence of administrative citations to unlicensed

13   operations is not a symptom of arbitrary enforcement or an unclear law, but rather, a consequence of

14   those operators' circumvention of the regulatory scheme. The court should reject Defendant's vagueness

15   arguments based on FMIA administrative enforcement.

16   ### 5.    The FMIA and Its Regulations Set Forth Specific Humane Methods.

17   Defendant next argues that the law does not adequately spell out which methods are humane.

18   Def.'s Mot. at 6-7. But the HMSA itself specifies that animals must be "rendered insensible to pain by a

19   single blow or gunshot or an electrical, chemical or other means that is rapid and effective, before being

20   shackled, hoisted, thrown, cast, or cut," or slaughtered in accordance with the religious exception in 7

21   U.S.C. § 1902(b). 7 U.S.C. § 1902(a). Defendant's assertion also ignores the statute's implementing

22   regulations, which set forth in even greater detail the specific methods that are "hereby designated and

23   approved as humane methods" pursuant to "the Act [FMIA]." 9 C.F.R. § 313.15. These include the

24   "captive bolt" instrument, *id.*; the use of anesthetizing gas, *id.* § 313.5; the discharge of a firearm in a

25   specific manner, *id.* § 313.16; and the use of electrical current in some instances. *Id.* § 313.30. The Ninth

26

27   ---
     [5] The fact that the Government Accountability Office identified certain problems with FSIS's humane slaughter inspection program twenty years ago, *see* Def.'s Mem. at 7, does not render the law vague or arbitrary as applied to Defendant's un-licensed, un-inspected operation today.

28

1    Circuit has held that courts must analyze a statute in concert with its regulations when weighing a

2    vagueness challenge. *See Zhi Yong Guo*, 634 F.3d at 1122–23. Each of these regulations in turn includes

3    detailed requirements as to the methodology. There is no vagueness problem regarding what conduct is

4    considered to be humane.

5              **6.      The FMIA Squarely Addresses Whether Products Must Be Capable of**
                         **Human Consumption.**

6

7              Defendant also claims that the FMIA is vague about whether it applies only to meat for human

8    consumption. Def.'s Mot. at 5-6. In fact, the provision at issue here, 21 U.S.C. § 610, answers this

9    question directly. It applies to "any cattle, sheep, swine, goats, horses, mules, or other equines, or any

10   carcasses, parts of carcasses, meat or meat food products of any such animals . . . . which are *capable of*

11   *use as human food*." 21 U.S.C. § 610 (emphasis added). The phrase "capable of use as human food" is

12   itself defined in the FMIA as "any carcass, or part or product of a carcass, of any animal, unless it is

13   denatured or otherwise identified as required by regulations prescribed by the Secretary to deter its use

14   as human food, or it is naturally inedible by humans." 21 U.S.C. § 601(k).[6]

15             In other words, all meat from enumerated species is assumed to be capable of human

16   consumption, and thus subject to the FMIA, unless the producer first takes the required steps to either

17   render it chemically foul-tasting to humans, or plainly label it as animal food prior to sale. The

18   regulations specify detailed methods for either of these options. *See* 9 C.F.R. § 325.13 (describing

19   approved methods for saturating meat with chemicals, dyes, and fuel oil to render meat unpalatable); *Id.*

20   § 325.11(a), (d) (setting forth detailed labeling requirements for products sold as animal food).

21   Defendant complied with neither of these. The witness was present for the entire sequence between the

22   animal's inhumane hoisting and slicing, and the moment the carcass was handed to him in pieces in

23   grocery bags. *See* Att. B. He did not see any effort by Defendant to denature the meat, or to label it as

24   animal food in accordance with the strict labeling requirements of the FMIA. *Id.*

25

26

---

[6] Articles that "are naturally inedible by humans" are items "such as hoofs, horns, and hides in their natural state." 9 C.F.R. § 325.19(e). Defendant removed these inedible parts in preparing the goat at issue for his customer, *see* Att. B, so they are not at issue here.

In sum, the FMIA may not be among the statutes most familiar to litigants in this district, but its provisions have for decades given sufficient notice to people of ordinary intelligence as to the conduct it proscribes. *Schwartzmiller*, 752 F.2d at 1345. Defendant seeks lenity, *see* Def.'s Mot. at 8-9, but "the rule of lenity applies only when the statutory language contains grievous ambiguity or uncertainty and when, after seizing everything from which aid can be derived, [a court] can make no more than a guess as to what Congress intended." *United States v. Banks,* 514 F.3d 959, 964 (9th Cir. 2008) (citations omitted). Because the humane slaughter provisions of the FMIA are not so grievously ambiguous that the Court must guess at their meaning, the Court should affirm their application here.

### E.     The Religious Slaughter Exemption Does Not Render the Information Invalid.

Defendant also seeks dismissal of the Information on the grounds that it alleges inhumane slaughter only under 7 U.S.C. § 1902(a), and not also under 7 U.S.C. § 1902(b), the religious slaughter provision. *See* Def.'s Mot. at 4. As Defendant points out, 7 U.S.C. § 1902(b) deems slaughtering in accordance with "the ritual requirements" of the Jewish faith or "any other religious faith," whereby "the animal suffers loss of consciousness by anemia of the brain caused by the simultaneous and instantaneous severance of the carotid arteries with a sharp instrument," to comply with the statute. *Id.* Defendant argues that because either 7 U.S.C. § 1902(a) or (b) are deemed to be humane methods, a charging instrument must allege both to foreclose all exceptions. Def.'s Mot. at 4. This argument misunderstands the nature of the violation.

While the Information includes a reference to 7 U.S.C. § 1902(a), the actual violation charged in the Information – the prohibition – is 21 U.S.C. § 610(b). As Defendant notes, 7 U.S.C. § 1902 does not contain its own enforcement mechanism. Def.'s Mot. at 3. Rather, the enforcement mechanism is found in 21 U.S.C. § 610(b), entitled "Prohibited acts," which incorporates the HMSA (7 U.S.C. § 1902) by reference. That prohibition does not distinguish between 7 U.S.C. § 1902(a) and (b), but rather, prohibits all slaughter "not in accordance with the Act of August 27, 1958 (72 Stat. 862; 7 U.S.C. 1901-1906)." 21 U.S.C. § 610(b). It therefore includes both parts of 7 U.S.C. § 1902. That prohibition – 21 U.S.C. § 610(b) – is the prohibition alleged in the Information. The citation to 7 U.S.C. § 1902(a) simply puts the Defendant on notice that the charge applies to non-religious slaughter.

The defendant in *United States v. Safeway Stores, Inc.* unsuccessfully attempted an argument similar to Defendant's, regarding another exception in the FMIA. 252 F.2d 99, 101 (9th Cir. 1958). In its motion to dismiss, Safeway argued that the government failed to allege that the "defendant does not come within the statutory exception [regarding certain butchering activities by grocers]." *Id.* at 100. The Court of Appeals rejected this argument, holding that "'an indictment or other pleading founded on a general provision defining the elements of an offense . . . need not negative the matter of an exception made by a proviso or other distinct clause, whether in the same section or elsewhere.'" *Id.* at 101 (quoting *McKelvey v. United States*, 260 U.S. 353 (1922)). Rather, the Court found, "it is incumbent on one who relies on such an exception to set it up and establish it" as a factual matter at trial. *Id.*

At worst, the citation to 7 U.S.C. § 1902(a) in the Information is surplusage. This is not a fatal defect in a charging instrument, but simply a superfluous provision that need not be proven at any trial. *See United States v. Wanland*, 657 Fed. App'x 631, 635 (9th Cir. 2016) (holding that "[i]nsofar as the language of an indictment goes beyond alleging elements of the crime, it is mere surplusage that need not be proved") (quoting *United States v. Jenkins*, 785 F.2d 1387, 1392 (9th Cir. 1986)). The humane slaughter prosecutions cited above in section (D)(3), which were charged in the same way as the Information here, underscore this point. There is no defect in the Information.

### F.      USDA Was Not Obligated to Give Defendant Notice Prior to Enforcement Action.

Finally, Defendant argues that USDA was obligated to, but did not, "give reasonable notice to the violator" before referring the matter to the Department of Justice. Def.'s Mem. at 8, n.1 (quoting 9 C.F.R. § 335.40(a)). Defendant's selective quotation glosses over the five enumerated exceptions to that provision, including that such notice "need not be provided . . . when the impending criminal referral involves suspicion of bribery and related offenses, *or clandestine slaughtering and/or processing operations*." 9 C.F.R. § 335.40(a)(4) (emphasis added). Plainly, Defendant operated a "clandestine slaughtering and/or processing operation[ ]," *id.*, placing him outside the notice requirement. The Court should give effect to this common sense provision, and reject Defendant's invocation of the notice requirement.

## V.      CONCLUSION

1    The FMIA and this prosecution are sound. Defendant's actions are exactly the type Congress

2  sought to prevent with this important animal cruelty and food safety law. The Court should reject

3  Defendant's attempts to evade liability, and deny his motion to dismiss.

4

5

6  DATED:  September 1, 2021                          Respectfully submitted,

7                                                      STEPHANIE M. HINDS
                                                       Acting United States Attorney
8
                                                       /s/ Anna Nguyen
9                                                      ANNA NGUYEN
                                                       Special Assistant United States Attorney
10

11                                                     *Of Counsel:*

12                                                     U.S. DEPARTMENT OF JUSTICE
                                                       ENVIRONMENT AND
13                                                     NATURAL RESOURCES DIVISION

14                                                     Ethan Eddy
15                                                     Trial Attorney
                                                       Environmental Crimes Section
16                                                     150 M St. NE
                                                       Washington, DC  20002
17                                                     Cal. Bar # 237214
                                                       (202) 305-0202
18                                                     ethan.eddy@usdoj.gov

19

20

21

22

23

24

25

26

27

28